676 So.2d 121 (1996)
Reina Ann WHITE, Individually and on Behalf of Her Minor Son John-Pierre White
v.
CITY OF BAKER Through the BAKER CITY POLICE DEPARTMENT.
No. 95 CA 2009.
Court of Appeal of Louisiana, First Circuit.
May 17, 1996.
Writ Denied September 27, 1996.
*122 Charles Wm. Roberts, Walter Landry Smith, Paul H. Due, Baton Rouge, for Plaintiffs-Appellants Reina White, individually and on behalf of her minor son, Jon Pierre White, James Robinson, Jr.
Bradley C. Myers, Baton Rouge, for Defendant-Appellee City of Baker.
Before WATKINS and FOIL, JJ., and TANNER, J. Pro Tem.[1]
THOMAS W. TANNER, Judge Pro Tem.
Plaintiff, Reina White, individually and on behalf of her minor son, Jon-Pierre White[2], (White) appeals from a judgment in favor of defendant, City of Baker through the Baker City Police Department (Baker), finding no liability on the part of Baker for an automobile accident which occurred on May 6, 1992 and resulted in the death of White's older son, Terrence White, and in injuries to Reina and Jon-Pierre. Melvin Kaufman was the driver of the pick-up truck in which Reina, Jon-Pierre and Terrence were passengers. Kaufman was never sued by plaintiff, although his negligence and legal fault were pled in a first supplemental and amending petition which named Allstate Insurance Company, the insurer of the pick-up truck, a defendant. Kaufman, Albert L. Judson and Allstate Insurance Company were named as third-party defendants by Baker; however, Allstate was dismissed with prejudice with a reservation of rights to proceed against all remaining defendants. Baker apparently never pursued its third-party claim against Kaufman.[3]

*123 FACTS
Sergeant Danny Beck and Officer Aaron Foret of the Baker Police were running stationary radar at approximately 5:30 PM in the 4500 block of Baker Boulevard in Baker, Louisiana on May 6, 1992 when they clocked the Kaufman pick-up truck, owned by Albert Judson and driven by Kaufman with Judson's permission, traveling 43 miles per hour in a 25 mile per hour speed zone. Reina White and her young son, Jon-Pierre, were passengers in the pick-up truck cab, and Terrence White, who was fourteen years old, was riding in the bed of the truck. White and her son, Terrence, were working on a Mother's Day project for their church and the family was going to Wal-Mart to obtain some materials they needed for the project. White, who could not drive and had no car, had asked Kaufman, whom she knew casually, for a ride to Wal-Mart.
The police officers attempted to flag down Kaufman by standing out in the street and waving, but he did not stop long enough for the officers to approach and issue a ticket, although he apparently slowed down. Kaufman testified in his statement made immediately after the accident that he thought the police officer was waving him through; Sergeant Beck thought he had made eye contact with Kaufman. Kaufman proceeded down Baker Boulevard, made a right turn onto McHugh Street, and made another right turn onto Jefferson Street. Sergeant Beck then instructed Officer Foret to follow Kaufman.
Foret followed the Kaufman truck and stopped it on Jefferson Street. Kaufman cooperated in getting out of the vehicle. At that point, Foret did not ask Kaufman for his license, his car registration, or his name; he asked Kaufman to follow him back to the radar location on Baker Boulevard.
Foret then drove back to McHugh Road, made a left turn, proceeded to the intersection with Baker Boulevard, turned left again and was driving back to the radar location. He saw in his rearview mirror that Kaufman had not followed him but had instead gone straight rather than turning left onto Baker Boulevard. Foret turned around on Baker Boulevard and proceeded to its intersection with McHugh Road. He could see the pick-up truck approximately three and a half tenths of a mile ahead of him, in the process of passing several cars. Kaufman appeared to Foret to be traveling faster than the posted thirty mile per hour speed limit. At that point he turned on the lights in his police unit. He testified that he felt it was necessary to catch up to the truck and get it to stop for the safety of the passengers, whom he had seen in the truck.
Foret was traveling forty to forty-five miles per hour by now, and testified he was not gaining on Kaufman. As Kaufman's truck rounded a curve on McHugh Road at the Tristian Village subdivision, Foret lost sight of the truck; the road surface changed from pavement to gravel and at that time he was blinded by "one big cloud of dust." Foret slowed down to ten or fifteen miles an hour. About four tenths of a mile from the curve at Tristian Village, and about two tenths of a mile down the gravel portion of the road, Foret saw the truck overturned in a ditch. He radioed for emergency assistance, went to the truck, and saw Kaufman getting out of the truck. The younger child, Jon-Pierre, was also out of the truck. Reina was still in the truck and injured; Foret was unable to extricate her. Terrence was lying in the ditch approximately twenty feet from the truck and could not be revived by emergency medical personnel. He was dead on arrival at Lane Memorial Hospital approximately half an hour later.
The entire episode, from the point at which Kaufman went straight rather than following Foret, lasted approximately forty seconds. Foret initially stated in his report that he had turned on his police siren, but upon listening to the audio tape of the incident, he realized that he had not turned on the siren until he drove into the dust on the gravel surface of McHugh Road.
Kaufman was tested for blood alcohol, but the results were negative. He told police *124 personnel in his video statement after the accident that he realized he did not have his driver's license when Foret stopped him; Reina White also testified in her video statement after the accident that Kaufman told her he didn't think he had his license, and he intended to outrun the police. Kaufman was charged with various traffic offenses as well as two counts of negligent injury and one count of manslaughter.

LAW
Plaintiff argues on appeal that the trial court failed to apply a proper duty/risk analysis on whether Foret's failure to ask for a driver's license, which would have prevented the later flight and pursuit and accident, was a legal cause of the death and injuries to the passenger, and that the trial court committed manifest error in finding that no pursuit occurred and consequently failing to reach other issues, such as whether the police department was independently negligent.
The trial judge stated, in pertinent part, in his written reasons for judgment:
The initial inquiry is the question of liability of the Baker Police Department by the actions of Officer Foret. The plaintiff contends that Officer Foret was negligent in pursuing the Kaufman vehicle and that the Department was negligent in allowing the pursuit and in failing to provide an adequate pursuit policy for the force. During the course of this incident Foret transmitted to the Department that he was in pursuit on McHugh Road. Additionally, in his report he writes: "With lights on and siren on I advised BPD at 17:41 hours that I was in pursuit." In his testimony he stated, however, that he was not in pursuit and after listening to the audio tape of the event he heard no siren noise until sometime later in the event than when he turned onto McHugh Road. In reconstructing the event, he estimated the total elapsed time to be about 40 seconds.
* * * * * *
The court agrees with Hugh Nugent [plaintiff's expert witness] that Officer Foret should have done a better job in this situation. It would seem almost basic, fundamental law enforcement procedure to require a driver to produce his drivers' license and the vehicle registration upon stopping the vehicle. Had Foret requested this information from Kaufman, it is likely that he would have refused to allow him to continue to drive the vehicle. He would either have impounded it and contacted the owner, parked it, or allowed someone else to drive it. In that case the tragic wreck would not have occurred. He should also have checked to see if the vehicle was stolen.
However, the failure to do these things is not the proximate cause of this accident. The attempt by Kaufman to elude the police is the reason that this accident occurred.... Thus, while Kaufman may have predicted that he would be followed or pursued and continued his reckless driving, the court does not find that Officer Foret was negligent and had any fault in this accident.
The court also concludes that the Baker Police Department was not negligent in failing to have a written pursuit policy in effect since the court finds that there was no pursuit. Even if the Department had a restrictive policy in effect at the time, it would have made no difference. Kaufman had initiated his action without any initiative from Foret. Because of the delay in turning around, proceeding to the intersection, turning onto McHugh, and the distance separating him from the Kaufman vehicle, there was no pursuit. This would have been synonymous with a restrictive policy.
An appellate court may not set aside a trial court's factual finding unless it is clear error or manifestly wrong. Stobart v. State through DOTD, 617 So.2d 880 (La. 1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989). Here, we agree with the trial court's factual finding that there was no pursuit in this case, and Foret's failure to obtain *125 Kaufman's drivers' license was not the cause of the accident, and we affirm the judgment.
Plaintiff argued at trial and on appeal that it was Foret's pursuit of Kaufman, and the failure of the City of Baker Police Department to have established a restrictive pursuit policy, which resulted in this accident. However, the trial judge's factual finding that no pursuit actually occurred is founded upon evidence and testimony in the record before us.
Plaintiff's expert witness, Hugh Nugent, testified concerning police procedures and pursuit policies. Nugent defined a pursuit as an attempt by an officer to stop someone who is aware that he is being pursued, and despite that fact, continues to attempt to evade apprehension.
Defendant called George Armbruster, with the Lafayette Parish Sheriff's Office, as an expert witness in police procedures and pursuit. He defined a pursuit essentially as did Nugent, "where a police officer is actively behind a fleeing vehicle and the driver of that vehicle is actively fleeing from that police officer and refusing to stop for one reason or another."
The trial court found that Kaufman was a full three-tenths of a mile ahead of Foret when Foret turned onto McHugh Road in the direction Kaufman was traveling. Foret testified that Kaufman was three and a half tenths of a mile ahead of him and was in the process of passing several cars after he turned to follow him; he also testified that although he could see the truck at that point, he didn't know at that time whether Kaufman could see him. Further, the amount of time it took Foret to turn around and follow Kaufman allowed Kaufman a considerable lead, which would make it difficult for him to know Foret was following him. Kaufman stated in his video statement that he didn't see the officer behind him. There is no other evidence to indicate that Kaufman knew Foret was behind him and was actively evading apprehension. Kaufman was not deposed and did not testify at trial, although he was present. Although Reina White testified that she heard the police siren and saw the lights, Foret's testimony indicated that he did not have on his siren, and Kaufman testified in his statement that he never saw lights or heard a siren. The trial judge apparently discounted Reina White's testimony, and we must give great deference to his credibility determinations. Plaintiffs failed to prove that Kaufman had knowledge of Foret's following him, and therefore failed to prove that a pursuit occurred.
Although the trial judge did not employ a traditional duty-risk analysis, he found that Kaufman initiated his actions without any initiative from Foret and the proximate cause of the accident was Kaufman's attempt to elude the police.
Under a duty-risk analysis, the determination of liability in a negligence case usually consists of proof of five separate elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability element); and (5) proof of actual damages (the damages element). The first element is usually a judge question, and the other four are usually jury questions unless reasonable minds could not differ. Fowler v. Roberts, 556 So.2d 1, 3 (La.1989), on reh'g, 556 So.2d 13 (La.1990).
The critical test in Louisiana for proximate cause is phrased in terms of the "ease of association" which melds policy and foreseeability into one inquiry: is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant? Roberts v. Benoit, 605 So.2d 1032, 1055, on reh'g, (La.1991). Legal cause requires a proximate relation between the actions of a defendant and the harm which occurs, and such relation must be substantial in character. Roberts v. Benoit, supra, at 1056.
A negative answer to any of the inquiries in the duty-risk analysis results in a *126 determination of no liability. Mathieu v. Imperial Toy Corporation, 94-0952 (La. 11/30/94), 646 So.2d 318, 326. Here, the trial court's determination that the proximate cause of the accident was Kaufman's actions rather than any actions of Foret is dispositive of the case, even absent a formal duty-risk analysis.
Although Sergeant Beck testified that during the stationary radar operation that day, several vehicles had been impounded when the police learned that the drivers were driving without a license, the plaintiff failed to prove that the accident would not have occurred but for Foret's failure to ask for Kaufman's license.
The plaintiff's expert, Hugh Nugent, testified that Foret should have requested Kaufman's license and the registration for the vehicle, that he should have followed the Kaufman vehicle back to the location rather than leading Kaufman, and that he should have checked the license tag to determine if the vehicle was stolen. However, he admitted on cross-examination that it was a common courtesy to ask the driver to return back to the radar site.
The defense expert, George Armbruster, testified that Foret's actions were not unreasonable based upon the information known to Foret at the time. When stopped, Kaufman was cooperative and agreed to return to the radar site. Foret also testified that his reason for not issuing a ticket at the time of the stop was that he did not have evidence as to speeding; it was only available back at the radar site with Sergeant Beck. Further, the assistant police chief for the City of Baker testified that the police department's radio air time resources were limited and it was not feasible for Foret to have radioed to find out if the vehicle was stolen.
A police officer's duty in effecting an arrest is to act reasonably under the totality of the circumstances; we believe the same formulation would be applicable in this situation in which Foret was attempting to apprehend Kaufman after he failed to follow him back to the radar site. See Mathieu v. Imperial Toy Corporation, supra, at 323. We agree with the trial court that even if Foret operated in a less than ideal manner by failing to ask for Kaufman's license or car registration, and by leading rather than following him back to the radar site, his actions were neither a cause-in-fact of the accident nor the proximate cause. Roberts v. Benoit, supra, at 1042. We have no way of knowing now, as Foret did not at the time, whether the accident would have occurred if Foret had asked for Kaufman's drivers' license. The defendant's conduct was not a "substantial factor" in bringing about the harm, and it is irrelevant whether Foret's actions were "lawful, unlawful, intentional, unintentional, negligent or non-negligent." Roberts v. Benoit, supra, at 1042.
Nor, under a proximate cause analysis, was there a proximate relation between the defendant's actions and the harm which occurs which is substantial in character. Roberts v. Benoit, supra, at 1056. Foret's actions must be judged in light of the totality of the circumstances, and hindsight is not applicable here. As the situation unfolded, Foret acted upon the information available to him with the resources his department provided. Once he knew that Kaufman was not following him, his obligation, according to defense expert Armbruster, was to ascertain what was going on.
Furthermore, we note that Foret's duty as the driver of an emergency vehicle was to "drive with due regard for the safety of all persons." La.R.S. 32:24(D). The driver of an emergency vehicle is not held to the more stringent duties applicable to ordinary motorists. Nelson v. State, Dept. of Public Safety, 581 So.2d 344, 347 (La.App. 3rd Cir. 1991), writ denied 586 So.2d 561 (La.1991); Smith v. English, 586 So.2d 583, 591 (La. App. 2d Cir.1991), writ den., 590 So.2d 80 (La.1991).
Numerous reported cases have found no liability for police officers in similar situations. Jones v. Murray, 250 So.2d 481 (La. App. 1st Cir.1971) is almost identical factually to the instant case. In that case, police officers allowed a motorist they had stopped for alleged traffic violations to reenter his car and follow them to the police station. He followed them a short distance, then turned and headed toward the expressway. He entered *127 the expressway at an excessive rate of speed and going the wrong way, and subsequently caused an accident. The motorist testified that he did not know the police officers were following him. The court found that there was no negligence on the part of the police officers which was a proximate cause of the accident. Jones v. Murray, supra, at 484. See also Puearry v. Dept. of Public Safety, 496 So.2d 1372 (La.App. 3rd Cir.1986); Vicknair v. Malbrough, 482 So.2d 45 (La.App. 5th Cir.), writ den. 484 So.2d 136 (La.1986); McElreath v. Progressive Insurance Co., 595 So.2d 693 (La.App. 5th Cir. 1992), writ den. 596 So.2d 557 (La.1992), Blunck v. Lloyds Underwriters of London, 93-1269 (La.App. 3rd Cir. 5/4/94), 640 So.2d 466, writ den. 94-C-1441 (La., 9/23/94), 642 So.2d 1290.
Because we agree with the trial court that no pursuit occurred in this case, we need not reach plaintiff's argument that the City of Baker is independently negligent because of its failure to enact a written restrictive pursuit policy prior to this accident. In this case, we agree with the trial judge that it would have made no difference to the outcome of this tragic accident if a written pursuit policy was in place.
We likewise do not reach the issue of whether Terrence's father's claim, which was asserted by a supplemental and amending petition on June 2, 1994, more than two years after the accident, has prescribed.
The judgment of the trial court is affirmed at plaintiff's cost.
AFFIRMED.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Jon-Pierre's name appears both as "John-Pierre" and "Jon-Pierre" in the record; likewise, Reina White's name appears both as "Renia" and "Reina." For purposes of this opinion, we will use the spellings "Jon-Pierre" and "Reina" to refer to plaintiffs. We note Jon-Pierre's birth certificate spells his name as "Jon" rather than "John".
[3] A receipt is in the record which acknowledges that Allstate Insurance Company paid $20,000.00 to Reina Ann White, individually and on behalf of her minor child, Jon-Pierre, on its own behalf as well as that of Melvin Kaufman. The document recognizes that Allstate's policy obligation ceases upon payment of the full policy limits of $20,000.00 and specifically states that no release of Melvin Kaufman was granted and all rights against Kaufman were reserved, although he would be entitled to an offset against any recovery against him.